MARK J. BOURASSA, ESQ. (NBN 7999)
JENNIFER A. FORNETTI, ESQ. (NBN 7644)
VALERIE S. GRAY, ESQ. (NBN 14716)
**THE BOURASSA LAW GROUP**
2350 W. Charleston Blvd., Suite 100
Las Vegas, Nevada 89102
Telephone:  (702) 851-2180
Facsimile:  (702) 851-2189
Email:       *mbourassa@blgwins.com*
              *jfornetti@blgwins.com*
              *vgray@blgwins.com*


GARY F. LYNCH (*pro hac vice forthcoming*)
PATRICK D. DONATHEN (*pro hac vice forthcoming*)
**LYNCH CARPENTER LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, Pennsylvania 15222
Telephone: (412) 322-9243
Email:       *gary@lcllp.com*
              *patrick@lcllp.com*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

***

| | |
|---|---|
| CHARLES BEZAK, on behalf of himself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> MGM RESORTS INTERNATIONAL. <br><br> Defendant. | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff CHARLES BEZAK ("Plaintiff") brings this Class Action Complaint on behalf of himself, and all others similarly situated, against Defendant MGM Resorts International ("MGM" or "Defendant"), alleging as follows based upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to him, which are based on personal knowledge:

/ / /

## NATURE OF THE ACTION

1.      Plaintiff brings this class action against MGM for its failure to properly secure its customers' sensitive personally identifiable information, including their names, contact information, gender, dates of birth, and driver's license numbers, Social Security numbers, and passport details (collectively, "PII"), and for failing to comply with industry standards to protect information systems that contain PII. Plaintiff seeks, among other things, damages, orders requiring MGM to fully and accurately disclose the nature of the information that has been compromised and to adopt reasonably sufficient security practices and safeguards to prevent incidents like this from reoccurring in the future, and for MGM to provide identity theft protective services to Plaintiff and Class Members for their lifetimes, as Plaintiff and Class Members will be at an increased risk of identity theft due to the conduct of MGM described herein.

2.      MGM is "global gaming and entertainment company with national and international locations featuring best-in-class hotels and casinos, state-of-the-art meetings and conference spaces, incredible live and theatrical entertainment experiences, and an extensive array of restaurant, nightlife and retail offerings."[1] MGM's portfolio encompasses some of the most recognized resort brands in the industry, including Bellagio, Mandalay Bay, MGM Grand, and Park MGM along the Las Vegas, Nevada Strip.

3.      In the course of providing customers with gaming and entertainment services, MGM requires customers to entrust it with their highly sensitive personal information. In turn, MGM comes into possession of and maintains files containing the PII of its customers and has a resulting duty to securely maintain such information.

4.      Despite MGM's duty to safeguard the PII of its customers, MGM suffered a large scale cyberattack on or about September 11, 2023, during which cybercriminals caused widespread disruption across Defendant's properties, shutting down ATMs and slot machines, and pulling the company's

---

[1] *Who We Are*, MGM Resorts, https://www.mgmresorts.com/en/company.html (last visited Oct. 20, 2023).

website and online booking systems offline (the "Data Breach").[2]  On or about October 5, 2023, MGM latter admitted that the cybercriminals responsible for the cyberattack had also exfiltrated customer PII from Defendant's computer systems.[3]

5.     Based on MGM's public statements to date, a wide variety of customer PII was implicated in the breach, including names, contact information, gender, dates of birth, and driver's license numbers, and, for some customers, their Social Security numbers and passport details.[4]

6.     As a direct and proximate result of MGM's failure to implement and follow basic security procedures, Plaintiff and Class Members' PII is now in the hands of cybercriminals.

7.     Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, and similar forms of criminal mischief, which risk may last for the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, energy, and money to protect themselves, to the extent possible, from these crimes.

8.     Plaintiff, on behalf of himself and all others similarly situated, alleges claims for negligence, breach of implied contract, unjust enrichment, violations of the Nevada Consumer Fraud Act, and declaratory judgment. Plaintiff seeks damages and injunctive relief, including the adoption of reasonably sufficient practices to safeguard PII in Defendant's custody in order to prevent incidents like the Data Breach from reoccurring in the future and for MGM to provide identity theft protective services to Plaintiff and Class Members for their lifetimes.

## PARTIES

9.     Plaintiff Charles Bezak is an adult who, at all relevant times hereto, is a citizen and resident of the State of Nevada. Plaintiff received a notification email from MGM informing him that his PII in Defendant's possession had been compromised in the Data Breach.

10.     Defendant MGM Resorts International is a Delaware corporation with its principal place

---

[2] Carly Page, *MGM Resorts confirms hackers stole customers' personal data during cyberattack*, TECHCRUNCH (Oct. 6, 2023), https://techcrunch.com/2023/10/06/mgm-resorts-admits-hackers-stole-customers-personal-data-cyberattack/.
[3] *Data Breach Notifications*, OFFICE OF THE MAINE ATTORNEY GENERAL, https://apps.web.maine.gov/online/aeviewer/ME/40/37d6cb69-b76c-48b5-8d46-d68bb59a5df5.shtml (last accessed Oct. 20, 2023).
[4] Page, *supra* note 2.

of business in Las Vegas, Nevada. MGM is a citizen of the States of Delaware and Nevada.

**JURISDICTION AND VENUE**

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 or more members of the proposed class, and at least one member of the proposed class is a citizen of a state different than Defendant.

12.     This Court has personal jurisdiction over Defendant because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District and Defendant resides in this District.

13.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.

**FACTUAL BACKGROUND**

**MGM Collected and Stored Plaintiff's and Class Members' PII.**

14.     MGM is a global entertainment company with numerous iconic locations along the Las Vegas Strip, and locations in other cities within the United States, including Massachusetts, Michigan, Mississippi, Maryland, and New Jersey.[5]

15.     MGM offers its customers state-of-the-art hotel rooms, entertainment, dining, casinos, and meeting and conference rooms spaces.[6]

16.     Upon information and belief, in the course of doing business with MGM, customers are required provide to provide their sensitive personal information to MGM, including their full names, financial account information, credit/debit card information, contact information, driver's license number, Social Security numbers, and passport information.

17.     In return for the provision of this sensitive information to MGM, customers reasonably believe that MGM will safeguard their highly sensitive information from those who would use it for nefarious purposes.

---

[5] *MGM Resort Destinations*, MGM Resports, https://www.mgmresorts.com/en/destinations.html (last accessed Oct. 20, 2023).

18.     By obtaining, collecting, and storing Plaintiff's and Class Members' PII, MGM assumed equitable and legal duties to safeguard Plaintiff's and Class Members' highly sensitive information.

19.     Despite these duties, however, MGM nevertheless employed inadequate data security measures to protect and secure the customer PII entrusted to it, resulting in the Data Breach and compromise of Plaintiff's and Class Members' PII.

**MGM Knew the Risks of Storing Valuable PII and the Foreseeable Harm to Victims.**

20.     MGM was well aware that the PII it collects is highly sensitive and of significant value to those who would use it for wrongful purposes.

21.     MGM also knew that a breach of its computer systems, and exposure of the information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose PII was compromised.

22.     These risks are not theoretical; in recent years, numerous high-profile breaches have occurred at business such as Equifax, Facebook, Yahoo, Marriott, Anthem, and many others.

23.     PII has considerable value and constitutes an enticing and well-known target to hackers. Hackers easily can sell stolen data as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[7]

24.     The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. In 2021, there were 4,145 publicly disclosed data breaches, exposing 22 billion records. The United States specifically saw a 10% increase in the total number of data breaches.[8]

25.     In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[9]

---

[6] *Id.*

[7]    Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

[8]    *Data Breach Report: 2021 Year End*, Risk Based Security (Feb. 4, 2022), https://www.riskbasedsecurity.com/2022/02/04/data-breach-report-2021-year-end/.

[9]    *Insurance Information Institute, Facts + Statistics: Identity theft and cybercrime*, Insurance Information    Institute,    https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-

26.     The hospitality industry has become a prime target for threat actors. A report by Cornell University and Freedom Pay found that "[n]early 31 percent of hospitality organizations have reported a data breach in their company's history, of which 89 percent have been affected more than once in a year."[10] Indeed, businesses in the hospitality sector are targeted by cybercriminals because they must balance guest satisfaction and reputation against staying secure.[11]

27.     The hospitality sector also faces unique cybersecurity risks as the nature of the industry "means a high turnover of staff, and more difficulty means a high turnover of staff, and more difficulty to keep on top of security training."[12] Further, because a hospitality business "serves hundreds of different customers on a daily basis, this means providing a network and bandwidth secure and large enough to keep up with the sheer number of users, while at the same time making businesses hesitant to deploy any patches and configuration changes as it may have an impact on the day-to-day operations."[13]

28.     The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves MGM customers especially vulnerable to identity theft, tax fraud, credit and bank fraud, and more.

29.     **Social Security Numbers**—Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique social security numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

---

cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited Oct. 20, 2023).
[10] Esther Hertzfeld, *Report: 31% of hospitality organizations have had a data breach*, Hotel Management (Sept. 8, 2023), https://www.hotelmanagement.net/tech/report-31-hospitality-organizations-have-had-data-breach.
[11] Nicole Deslandes, *Over a third of hospitality organizations have reported a data breach*, Tech Informed (Sept. 8, 2023), https://techinformed.com/over-a-third-of-hospitality-organisations-have-reported-a-data-breach/.
[12] *Id.*
[13] *Id.*

-6-

30.     The Social Security Administration even warns that the process of replacing a Social Security is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.

> If you receive a new Social Security Number, you should not be able to use the old number anymore.

> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[14]

31.     Social Security Numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often social security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes social security numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

32.     **Driver's License Numbers—**are highly sought after by cyber criminals on the dark web because they are unique to a specific individual and extremely sensitive. This is because a driver's license number is connected to an individual's vehicle registration, insurance policies, records on file with the DMV, places of employment, doctor's offices, government agencies, and other entities.

33.     For these reasons, driver's license numbers are highly sought out by cyber criminals because they are one of the most valuable pieces of information to facilitate identity theft and fraud. This information is valuable because cyber criminals can use this information to open credit card accounts,

---

[14] *Identify Theft and Your Social Security Numbers*, Social Security Admin. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

obtain insurance policies and submit fraudulent claims, open cell phone contracts, file fraudulent tax returns, file unemployment applications, as well as obtain bank loans under a person's name.

34.    Further, unlike credit or debit card numbers in a payment card data breach, which can quickly be frozen and reissued in the aftermath of a breach, the type of PII at stake here—unique driver's license numbers—cannot be easily replaced.

35.    **Passport Details**—As explained by Aura, a leading identity theft protection service, "[p]assports are among the most widely accepted forms of identification, making them prime targets for scammers and fraudsters. If scammers steal your passport number, they can impersonate you, create fake travel documents, or even open bank accounts in your name."[15] Indeed, when combined with other PII, such as a name, address, or picture, a "passport number enables scammers to impersonate you, access your online accounts, or target you in sophisticated scams that lead to identity theft."[16]

36.    Moreover, "[u]nlike credit card data or personal Social Security numbers, there are few mechanisms in place to alert consumers that their passport numbers have been stolen and possibly used for fraud" making it difficult to determine if criminals are using a forged or fraudulent passport in an individual's name.[17]

37.    The ramifications of MGM's failure to keep Plaintiff's and Class Members' PII secure are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[18]

---

[15] Yaniv Masjedi, *What Can Scammers Do With Your Passport Number?*, Aura (Apr. 12, 2023), https://www.aura.com/learn/what-can-someone-do-with-your-passport-number#:~:text=If%20scammers%20steal%20your%20passport,could%20still%20be%20at%20risk.

[16] *Id.*

[17] Kate Fazzini, *Here's how criminals use stolen passport information*, CNBC (July 5, 2019), https://www.cnbc.com/2019/07/05/how-criminals-use-stolen-passport-information.html.

[18] U.S. Gov't Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/new.items/d07737.pdf (last visited Oct. 20, 2023).

38.     Even if stolen PII does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

39.     Based on the value of its customers' PII to cybercriminals, MGM knew or should have known, the importance of safeguarding the PII entrusted to it and of the foreseeable consequences if its data security systems were breached. MGM, however, to take adequate cyber security measures to prevent the Data Breach from occurring.

**MGM Demonstrates a Reckless Disregard for Data Security.**

40.     MGM has a responsibility to securely maintain the customer PII that it receives and keep it safe from harm. Despite this duty, MGM has been breached twice by cybercriminals since 2019.

41.     In the Summer of 2019, MGM suffered a data breach when a hacker gained access to one of Defendant's cloud servers and stole information relating to MGM's hotel guests. [19]

42.     The breached information included 10 million records of guests at MGM's hotels and was later distributed for free on a hacking form. The breached information included guest names, dates of birth, phone numbers, and physical addresses.[20]

43.     Despite being aware that its data security measures were insufficient to prevent a data breach occurring, MGM failed to implement adequate data security measures after 2019 and suffered a second data breach in September 2023 that compromised sensitive customer information.

/ / /

/ / /

---

[19] Catalin Cimpanu, *A hacker is selling details of 142 million MGM hotel guests on the dark web*, ZD Net (July 13, 2023), https://www.zdnet.com/article/a-hacker-is-selling-details-of-142-million-mgm-hotel-guests-on-the-dark-web/.

[20] Ionut Ilascu, *Hackers Share Stolen MGM Resorts Guest data Base with 10M+ Records*, Bleeping Computer (Feb. 20, 2020), https://www.bleepingcomputer.com/news/security/hackers-share-stolen-mgm-resorts-guest-database-with-10m-records/.

**MGM Breached its Duty to Protect Customers' PII.**

44.    On or about September 11, 2023, MGM disclosed that it had suffered a large-scale cyberattack. The attack "caused widespread disruption across MGM's properties, shutting down ATMs and slot machines and pulling the company's website and online booking systems offline."[21]

45.    Indeed, reports on social media from September 11, 2023, indicated "outages impacting ATM cash dispensers and slot machines at MGM's Las Vegas casinos, and forced hotel restaurants to accept cash-only payments."[22] "Guests also report[ed] that they [could not] charge anything to their rooms and [were] unable to use their digital room keys."[23]

46.    A notice on MGM's website, which was also impacted by the attack, confirmed that the cyberattack impacted all of Defendant's Las Vegas resorts and further advised guests "to call to make a reservation or to speak to a concierge."[24]

47.    New reports further indicated that the cyberattack impacted all of MGM's properties, including those outside of Las Vegas and their respective websites.[25]

48.    A few days after the cyberattack began, Scattered Spider, a subgroup of the ALPHV/BlackCat ransomware gang, claimed responsibility for the attack.[26] Specifically Scattered Spider claimed to have infiltrated MGM's infrastructure and encrypted more than 100 ESXi hypervisors after MGM took down its internal infrastructure.[27] Scatter Spider further claimed to have exfiltrated data from MGM's network and threatened to deploy new attacks unless MGM agreed to pay a ransom.[28]

49.    MGM brought an end to the computer shutdown on or about September 20, 2023.[29]

---

[21] Page, *supra* note 2.

[22] Carly Page, *MGM Resorts blames 'cybersecurity issue' for ongoing outage*, TechCrunch (Sept. 11, 2023), https://techcrunch.com/2023/09/11/mgm-resorts-cybersecurity-issue-outage/.

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] Ionut Ilascu, *MGM casino's ESXi servers allegedly encrypted in ransomware attack*, BleepingComputer (Sept. 14, 2023), https://www.bleepingcomputer.com/news/security/mgm-casinos-esxi-servers-allegedly-encrypted-in-ransomware-attack/.

[27] *Id.*

[28] *Id.*

[29] Ken Ritter, *MGM Resorts computers back up after 10 days as analysts eye effects of casino cyberattacks*, AP News (Sept. 21, 2023), https://apnews.com/article/vegas-mgm-resorts-caesars-cyberattack-shutdown-a01b9a2606e58e702b8e872e979040cc.

50.     According to news reports, Scattered Spider's cyberattack began with a "simple social engineering scam."[30] A cybercriminal impersonated an MGM employee using information found on LinkedIn.[31] "The criminal then contacted the company's IT department requesting a password reset. Unaware of the impersonation, the IT department complied, giving the attacker access to the employee's account. This ultimately led to the cybercriminal gaining control over MGM's entire system."[32]

51.     On or about October 6, 2023, MGM confirmed that customer PII was exfiltrated during the Data Breach.[33] According to MGM, the cybercriminals were able to steal PII belonging to customers who transacted with MGM prior to 2019.[34] This information includes names, contact information, gender, dates of birth, driver's license numbers, Social Security numbers, and passport details.[35]

52.     While MGM has not disclosed size of the Data Breach, it is likely that the Data Breach compromised the PII of millions of individuals as MGM attracts "tens of millions of visitors each year."[36]

53.     During social engineering attacks, such as the one that lead to the Data Breach, an attacker will pose "as an individual with a legitimate need for information such as an IT worker who needs a person to 'verify their login credentials,' or a new employee who urgently needs an access token but doesn't know the proper procedure to acquire one."[37] Once the attacker has tricked a person into handing over access credentials, the attacker can then use that information to gain access to an entity's systems.

54.     Companies with adequate cybersecurity measures will employ one or more of the following measures to guard against social engineering attacks:

---

[30] Venatesh Jartarkar, *MGM Resorts suffers $52 million loss from cyberattack due to social engineering scam*, Investing.com (Sept. 22, 2023), https://www.investing.com/news/stock-market-news/mgm-resorts-suffers-52-million-loss-from-cyberattack-due-to-social-engineering-scam-93CH-3180791?utm_source=yahoo&utm_medium=referral&utm_campaign=yahoo_finance.
[31] *Id.*
[32] *Id.*
[33] Page, *supra* note 2.
[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] Bart Lenarerts-Bergmans, *What is Social Engineering?*, CrowdStrike (May 23, 2023), https://www.crowdstrike.com/cybersecurity-101/social-engineering/.

a.     Employ security awareness training to remind employees of common practices, including (1) being wary of emails or phone calls requesting account information, (2) not providing usernames, passwords, dates of birth, Social Security numbers, financial data, or other personal information in response to an email or robocall, (3) independently verify any requested information originating from a legitimate sort;

b.     Employ cybersecurity solutions; and

c.     Employ zero trust architecture, limited a user's access to specific systems to perform specific tasks, and only for a limited period of time.[38]

55.     Upon information and belief, the Data Breach is the direct and proximate result of MGM's failure to implement one or more of the above data security measures.

**FTC Guidelines Prohibit MGM from Engaging in Unfair or Deceptive Acts or Practices.**

56.     MGM is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act

57.     The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[39]

58.     The FTC provided cybersecurity guidelines for businesses, advising that businesses should protect personal customer information, properly dispose of personal information that is no longer needed, encrypt information stored on networks, understand their network's vulnerabilities, and implement policies to correct any security problems.[40]

---

[38] *Id.*

[39] *Start with Security: A Guide for Business*, Fed. Trade Comm'n, https://www.ftc.gov/business-guidance/resources/start-security-guide-business (last visited Oct. 20, 2023).

[40] *Protecting Personal Information: A Guide for Business*, Fed. Trade Comm'n, https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited Oct. 20, 2023).

59.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[41]

60.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

61.    Upon information and belief MGM failed to properly implement one or more of the basic data security practices recommended by the FTC. MGM's failure to employ reasonable and appropriate data security measures to protect against unauthorized access to customers' PII constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

62.    MGM was at all times fully aware of its obligations to protect the PII customers because of its position as an entertainment and gaming provider, which gave it direct access to reams of PII. MGM was also aware of the significant repercussions that would result from its failure to do so.

**Plaintiff's Experience.**

63.    Plaintiff was a customer at one or more of MGM's resorts. In order to do business with MGM, Plaintiff was required to entrust MGM with his PII and in return, reasonably expected that MGM would safeguard his PII from unauthorized access.  On or about October 19, 2023, however, Plaintiff received an email notification from MGM informing him that his PII in MGM's possession had been compromised in the Data Breach.

64.    MGM has offered Plaintiff little remedial measures to protect his PII going forward, other than stating it had arranged with Experian to offer Plaintiff credit monitoring and identity protection services for two years. This offer is time-limited and will expire long before the threat to Plaintiff's PII is exhausted. MGM also put the onus on Plaintiff to protect his PII, "recommend[ing] that [he] remain vigilant for incidents of fraud and identity theft by reviewing account statements and monitoring [his]

[41] *Id.*

free credit reports."[42] MGM further "recommend[ed] that [Plaintiff] remain alert for unsolicited communications involving [his] personal information."[43]Plaintiff has suffered actual injury from having his PII exposed and/or stolen as a result of the Data Breach, including: (1) required mitigation efforts, including needing to monitor his financial and other accounts to ensure his information is not used for identity theft and fraud; (b) damages to and diminution of the value of his PII, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; and (c) loss of privacy.

65.      In addition, knowing that hackers accessed and likely exfiltrated his PII and this information is likely has been and will be used in the future for identity theft, fraud, and other nefarious purposes has caused Plaintiff to experience significant frustration, anxiety, worry, stress, and fear.

66.      As a direct and proximate result of the Data Breach, Plaintiff has been and will continue to be at a heightened risk for fraud and identity theft and its attendant damages for years to come. Such a risk is real and certainly impending, and is not speculative, given the highly sensitive nature of the PII compromised in the Data Breach.

**Plaintiff and Class Members Have Suffered Damages.**

67.      For the reasons mentioned above, MGM's conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members significant injuries and harm in several ways, including actual fraud as well as substantial and imminent risk of identity theft and fraud. Plaintiff\ and Class Members must immediately devote time, energy, and money to: (1) closely monitor their bills, records, and credit and financial accounts; (2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering, spear phishing, or extortion attacks; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

68.      Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiff and Class Members will

---

[42] *Data Breach Notifications*, *supra* note 3.
[43] *Id.*

need to maintain these heightened measures for years, and possibly their entire lives as a result of MGM's conduct. Further, the value of Plaintiff's and Class Members' PII has been diminished by its exposure in the Data Breach.

69.     As a result of MGM's failures, Plaintiff and Class Members face an increased risk of identity theft, phishing attacks, and related cybercrimes because of the Data Breach. Those impacted are under heightened and prolonged anxiety and fear, as they will be at risk of falling victim to cybercrimes for years to come.

70.     Indeed, PII is a valuable commodity to identity thieves and once it has been compromised, criminals will use them and trade the information on the cyber black market for years thereafter. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[44] Similarly, Trustwave has indicated that passports and driver's licenses can sell between $1-$50 on the dark web. [45]

71.     The reality is that cybercriminals seek nefarious outcomes from a data breach and stolen PII can be used to carry out a variety of crimes.

72.     Plaintiff and Class Members are also at a continued risk because their information remains in MGM's systems, which have already been shown to be susceptible to compromise and attack and is subject to further attack so long as MGM fails to undertake the necessary and appropriate security and training measures to protect its customers' PII.

73.     Plaintiff and Class Members have lost the benefit of their bargains. Plaintiff and Class Members entered into agreements with and provided payment to MGM under the reasonable but mistaken belief that it would reasonably and adequately protect their PII. Plaintiff and Class Members would not have entered into such agreements and would not have paid MGM the amount that they paid had they known that MGM would not reasonably and adequately protect their PII. Plaintiff and Class

---

[44] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10xprice-of-stolen-credit-card-numbers.html.

[45] *The Price Cybercriminals Charge for Stolen Data*, Trustwave (Aug. 6, 2023), https://www.trustwave.com/en-us/resources/blogs/spiderlabs-blog/the-price-cybercriminals-charge-for-stolen-data/.

Members have thus suffered actual damages in an amount at least equal to the difference in value between the services that include reasonable and adequate data security that they bargained for, and the services that do not, which they actually received.

74.     Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private information to strangers and cybercriminals.

## CLASS ACTION ALLEGATIONS

75.     Plaintiff brings this class action on behalf of himself and all others who are similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.

76.     Plaintiff seeks to represent the following Class of persons defined as follows:

> All individuals in the United States whose PII was compromised in the MGM Data Breach which occurred on or September 11, 2023 (the "Class").

77.     Excluded from the Class is Defendant, its subsidiaries and affiliates, officers and directors, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

78.     This proposed class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the class definition in an amended pleading or when he moves for class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

79.     **Numerosity:** The members of the Class are so numerous that the joinder of all members is impractical. Plaintiff is informed and believes, and thereon alleges, that there are at minimum, millions of members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through MGM's records, including but not limited to the files implicated in the Data Breach.

/ / /

/ / /

/ / /

80. **Commonality:** This action involved questions of law and fact common to the Class. Such common questions include but are not limited to:

        a.      Whether MGM had a duty to protect the PII of Plaintiff and Class Members;

        b.      Whether MGM was negligent in collecting and storing Plaintiff's and Class Members' PII, and breached its duties thereby;

        c.      Whether MGM entered into contracts implied in fact with Plaintiff and the Class;

        d.      Whether MGM breached those contracts by failing to adequately safeguard Plaintiff's and Class Members' PII;

        e.      Whether MGM was unjust enriched to the detriment of Plaintiff and the Class;

        f.      Whether MGM's conduct is violative of the Nevada Consumer Fraud Act, Nev. Rev. Stat. § 41.600;

        g.      Whether Plaintiff and Class Members are entitled to damages as a result of MGM's wrongful conduct; and

        h.      Whether Plaintiff and Class Members are entitled to restitution as a result of MGM's wrongful conduct.

81. **Typicality:** Plaintiff's claims are typical of the claims of Class Members. Plaintiff's and Class Members' claims are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiff and Class Members were all customers of MGM, each having their PII exposed and/or accessed by an unauthorized third party.

82. **Adequacy:** Plaintiff is an adequate representatives of the Class. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the Class Members and have no interests antagonistic to the Class Members. In addition, Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiff and the Class Members are substantially identical as explained above.

83. **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all Class members is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of

scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

84.    **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendant breached its duty to Plaintiff and Class Members, then Plaintiff and each Class member suffered damages by that conduct.

85.    **Injunctive Relief:** Defendant has acted and/or refused to act on grounds that generally apply to the Class making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. Civ. P. 23 (b)(2).

86.    **Ascertainability:** Class Members are ascertainable. Class membership is defined using objective criteria and Class Members may be readily identified through MGM's books and records.

## FIRST CAUSE OF ACTION
### NEGLIGENCE
### (Plaintiff on Behalf of Class)

87.    Plaintiff restates and realleges all proceeding allegations above as if fully set forth herein.

88.    Plaintiff brings this claim individually and on behalf of the Class.

89.    MGM owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. More specifically, this duty including, among other things: (a) designing, maintaining, and testing its security systems to ensure that Plaintiff's and Class Members' PII in MGM's possession was adequately secured and protected; (b) implementing processes that would detect a breach of its security system in a timely manner; (c) timely acting upon warnings and alerts, including those generated by its own security systems, regarding intrusions to its networks; and (d) maintaining data security measures consistent with industry standards.

90.    MGM's duty to use reasonable care arose from several sources, including but not limited to those described below.

/ / /

-18-

91.    MGM had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendant. By collecting and storing valuable PII that is routinely targeted by cybercriminals for unauthorized access, MGM was obligated to act with reasonable care to protect against these foreseeable threats.

92.    MGM also owed a common law duty because its conduct created a foreseeable risk of harm to Plaintiff and Class Members. MGM's conduct included its failure to adequately restrict access to its computer networks that held customers' PII.

93.    MGM also knew or should have known of the inherent risk in collecting and storing massive amounts of PII, the importance of implementing adequate data security measures to protect that PII, and the frequency of cyberattacks such as the Data Breach in the hospitality sector.

94.    Further, MGM's duty arose from various statutes requiring Defendant to implement reasonable data security measures, including but not limited to, Section 5 of the FTC Act and Nev. Rev. Stat. § 603A.210. For example, Section 5 of the FTC Act required Defendant to take reasonable measures to protect Plaintiff's and the Class's sensitive data and is a further source of Defendant's duty to Plaintiff and the Class. Section 5 of the FTC Act prohibits unfair practices in or affecting commerce, including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Defendant of failing to use reasonable measures to protect highly sensitive data. Therefore, Defendant was required and obligated to take reasonable measures to protect data it possessed, held, or otherwise used. The FTC publications and data security breach orders described herein further form the basis of Defendant's duties to adequately protect sensitive information. By failing to implement reasonable data security measures, Defendant acted in violation of Section 5 of the FTC Act.

95.    MGM is subject to an "independent duty," untethered to any contract between Defendant and Plaintiff and Defendant and Class Members. The sources of MGM's duty are identified above.

96.    MGM's violation of Section 5 of the FTC Act, and state data security statutes constitutes negligence *per se* for purposes of establish the duty and breach elements of Plaintiff's negligence claim. Those statutes were designed to protect a group to which Plaintiff and Class Members belong and to prevent the type of harm that resulted from the Data Breach.

97.    Defendant breached the duties owed to Plaintiff and Class Members and thus was negligent. Defendant breached these duties by, among other things, failing to: a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and to its customers; and (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII.

98.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff's and Class Members PII and would not have been compromised and or exfiltrated from MGM's computer systems.

99.    As a direct and proximate result of MGM's negligence, Plaintiff and Class Members have suffered injuries, including: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect PII in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

/ / /

100.    As a direct and proximate result of MGM's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, damages in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**
**(Plaintiff on behalf of the Class)**

101.    Plaintiff restates and realleges all preceding allegations set forth above as if fully alleged herein.

102.    Plaintiff brings this claim individually and on behalf of the Class.

103.    When Plaintiff and Class Members provided their PII to MGM in exchange for gaming and entertainment services, they entered into implied contracts with Defendant, under which MGM agreed to take reasonable steps to protect Plaintiff's and Class Members' PII.

104.    MGM solicited and invited Plaintiff and Class Members to provide their PII, including their names, addresses, dates of birth, phone numbers, email addresses, various forms of identification, as part of Defendant's provision of gaming and entertainment services. Plaintiff and Class Members accepted MGM's offers and provided their PII to Defendant.

105.    When entering into implied contracts, Plaintiff and Class Members reasonably believed and expected that MGM employed adequate data security measures to safeguard their PII. Implicit in the agreement between Plaintiff and Class Members and Defendant to provide PII, was the latter's obligation to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) to prevent unauthorized disclosures of the PII, (d) to provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) to reasonably safeguard and protect the PII of Plaintiff and Class Members from unauthorized disclosure or uses, (f) to retain the PII only under conditions that kept such information secure and confidential.

106.    Plaintiff is informed and believes that in Defendant's written privacy policies, MGM expressly promised Plaintiff and Class Members that Defendant implement data security measures to protect their PII, including storing PII on systems protected by industry standard security measures and training to staff to take reasonable measures to ensure that unauthorized person cannot view or access

PII.[46] Plaintiff and Class Members paid money to MGM in the form of monies made for payments in order to receive gaming and entertainment services. Plaintiff and Class Members reasonably believed and expected that MGM would use part of those funds to obtain adequate data security. MGM failed to do so.

107.    Plaintiff and Class Members would not have provided their PII to Defendant had they known that MGM would not safeguard their PII as promised.

108.    Plaintiff and Class Members fully performed their obligations under their implied contracts with MGM.

109.    MGM breached its implied contracts with Plaintiff and Class Members by failing to safeguard Plaintiff's and Class Members' PII.

110.    The losses and damages Plaintiff sustained, include, but are not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect PII in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

111.    As a direct and proximate result of MGM's breach of implied contract, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

---

[46] *Privacy Policy*, MGM Resorts, https://www.mgmresorts.com/en/privacy-policy.html (last visited Oct. 20, 2023).

### THIRD CAUSE OF ACTION
**UNJUST ENRICHMENT**
**(Plaintiff on Behalf of the Class)**

112.    Plaintiff restates and realleges all proceeding factual allegations above as if fully set forth herein.

113.    Plaintiff brings this claim individually and on behalf of the Class in the alternative to Plaintiff's Breach of Implied Contract claim.

114.    Upon information and belief, MGM funds its data security measures entirely from its general revenue, including payments made by or on behalf of Plaintiff and Class Members.

115.    As such, a portion of the payments made by or on behalf of Plaintiff and Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to MGM.

116.    Plaintiff and Class Members conferred a monetary benefit on MGM. Specifically, they purchased goods and services from Defendant and in so doing provided Defendant with their PII. In exchange, Plaintiff and Class Members should have received from MGM the goods and services that were the subject of the transaction and have their PII protected with adequate data security.

117.    MGM knew that Plaintiff and Class Members conferred a benefit which Defendant accepted. MGM profited from these transactions and used the PII of Plaintiff and Class Members for business purposes, including very personal photographs taken of Plaintiff and Class Members.

118.    In particular, MGM enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII. Instead of providing a reasonable level of security that would have prevented the Data Breach, MGM instead calculated to increase its own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

119.    Under the principles of equity and good conscience, MGM should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

/ / /

120.    MGM failed to secure Plaintiff's and Class Members' PII and, therefore, did not provide full compensation for the benefit Plaintiff and Class Members provided.

121.    MGM acquired Plaintiff's and Class members' PII through inequitable means in that Defendant failed to disclose the inadequate security practices previously alleged.

122.    If Plaintiff and Class Members knew that Defendant had not secured their PII, they would not have agreed to provide their PII to MGM, including very personal photographs taken of Plaintiff and Class Members.

123.    Plaintiff and Class Members have no adequate remedy at law.

124.    As a direct and proximate result of MGM's wrongful conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect PII in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

125.    As a direct and proximate result of MGM's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

126.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that it unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services, or Defendant should be compelled to place a percentage of all future profits into a common fund or constructive trust, for the benefit of Plaintiff and Class Members,

designed to represent the value obtained by the use of the inadequately secured PII compromised as a result of the Data Breach.

### FOURTH CAUSE OF ACTION
### VIOLATION OF THE NEVADA CONSUMER FRAUD ACT
### Nev. Rev. Stat. § 41.600
### (Plaintiff on Behalf of the Class)

127.    Plaintiff restates and realleges all proceeding factual allegations above as if fully set forth herein.

The Nevada Consumer Fraud Act, Nev. Rev. Stat. § 41.600 states in relevant part:

An action may be brough by any person who is a victim of consumer fraud. As used in this section, "consumer fraud" means: . . . A deceptive trade practice defined in NRS 598.0915 to 598.0225, inclusive.

Nev. Rev. Stat. § 41.600(1) & (2)€.

128.    In turn, Nev. Rev. Stat. § 598.0923(2) provides that "[a] person engages in a 'deceptive trade practice' when in the course of his or her business or occupation he or she knowingly . . . [f]ails to disclose a material fact in connection with the sale or lease of goods or services." *Id.* MGM violated this provision because it failed to disclose the material fact that its data security measures were inadequate to reasonably safeguard its customers' PII. This is true because, among other things, MGM was aware that the hospitality sector is a frequent target of cyberattacks such as the Data Breach. MGM knew or should have known that that its data security measures were insufficient to guard against attacks such as the Data Breach. MGM and knowledge of the facts that constituted the omission MGM could have and should have made a proper disclosure when accepting new customers, while providing its goods and services to customers, or by any other means reasonably calculated to inform customers of its inadequate data security measures.

129.    Further, Nev. Rev. Stat. § 598.0923(3) provides that "[a] person engages in a 'deceptive trade practice' when in the course of his or her business or occupation he or she knowingly . . . [v]iolates a state or federal statute or regulation relating to the sale or lease of goods or services." *Id.* MGM violated this provision for several reasons, each of which serves as an independent basis for violating Nev. Rev. Stat. § 598.0923(3).

130.    First, MGM breached its duty under Nev. Rev. Stat. § 603A.210, which requires any data collector "that maintains records which contain personal information" of Nevada residents to "implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, . . . use, modification or disclosure." *Id.*  MGM is a "data collector" as defined by Nev. Rev. Stat. § 603A.030. MGM failed to implement such reasonable security measures, as shown by a system-wide breach of its computer systems during which a threat actor exfiltrated customer PII. MGM's violation of this statute was done knowingly for the purposes of Nev. Rev. Stat. § 598.0923(3) because MGM knew or should have known that the hospitality sector is a frequent target of cyberattacks such as the Data Breach. MGM knew or should have known that its data security measures were inadequate to protect against cyberattacks such as the Data Breach.

131.    Second, MGM violated Section 5 of the FTC Act, as alleged above. MGM knew or should have known that its data security measures were inadequate, violated Section 5 of the FTC Act, and failed to adhere to the FTC's data security guidance. This is true because MGM was well aware that the hospitality sector is a frequent target of cyberattacks such as the Data Breach and the FTC has recommended various data security measures that companies such as Defendant could have implemented to mitigate the risk of a Data Breach. MGM chose not to follow such guidance and knew or should have known that its data security measures were inadequate to guard against cyberattacks such as the Data Breach. MGM had knowledge of the facts that constituted the violation. MGM's violation of Section 5 of the FTC Act serves as a separate actional basis for purposes of violating Nev. Rev. Stat. § 598.0923(3).

132.    MGM engaged in an unfair practice by engaging in conduct that is contrary to public policy, unscrupulous, and caused injury to Plaintiff and Class Members.

133.    Plaintiff and members of the Class were denied a benefit conferred on them by the Nevada legislature.

134.    As a direct and proximate result of the foregoing, Plaintiff and Class Members have suffered injuries including, but not limited to actual damages, and in being denied a benefit conferred on them by the Nevada legislature.

135.    As a result of these violations, Plaintiff and Class Members are entitled to an award of actual damages, equitable injunctive relief requiring Defendant to implement adequate data security measures, as well as an award of reasonable attorney's fees and costs. Nev. Rev. Stat. § 41.600(3).

**FIFTH CAUSE OF ACTION**
**DECLARATORY JUDGMENT**
**(Plaintiff on behalf of the Class)**

136.    Plaintiff restates and realleges all preceding allegations set forth above as if fully alleged herein.

137.    Plaintiff brings this claim individually and on behalf of the Class.

138.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

139.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and whether MGM is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII. Plaintiff alleges that Defendant's data security measures remain inadequate. Furthermore, Plaintiff and Class Members continue to suffer injury as a result of the compromise of their PII and remain at imminent risk that further compromises of their PII will occur in the future.

140.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that, among other things:

a.    MGM owed a legal duty to secure customers' PII under the common law, Section 5 of the FTC Act, and state data security laws; and

b.    MGM breached and continues to breach this legal duty by failing to employ reasonable measures to secure customers' PII.

141.    This Court also should issue corresponding prospective injunctive relief requiring MGM to employ adequate security protocols consistent with law and industry standards to protect customers' PII.

142.    If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at MGM. The risk of another such

breach is real, immediate, and substantial. If another breach at MGM occurs, Plaintiff and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

143.    The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to MGM if an injunction is issued. Plaintiff and Class Members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to MGM of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and MGM has a pre-existing legal obligation to employ such measures.

144.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at MGM, thus eliminating the additional injuries that would result to Plaintiff, Class Members, and consumers whose confidential information would be further compromised.

## **DEMAND FOR JURY TRIAL**

Please take notice that Plaintiff demands a trial by jury as to all issues so triable in this action.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and all other similarly situated, pray for relief as follows:

1.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

2.    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

3.    For compensatory damages on behalf of Plaintiff and the Class;

4.    For punitive damages on behalf of Plaintiff and the Class;

5.    For an order of restitution and all other forms of equitable monetary relief;

6.    Declaratory and injunctive relief as described herein;

7.    For disgorgement and/or restitution as the Court deems appropriate, just, and proper;

8.    Awarding Plaintiff reasonable attorneys' fees, costs, and expenses;

9.    Awarding pre- and post-judgment interest on any amounts awarded;

10.     For reimbursement for all costs and expenses incurred in connection with the prosecution of these claims; and

11.     Awarding such other and further relief as may be just and proper.

Dated this 20th day of October, 2023.

THE BOURASSA LAW GROUP

*/s/__Jennifer A. Fornetti_____*
MARK J. BOURASSA, ESQ. (NBN 7999)
JENNIFER A. FORNETTI, ESQ. (NBN 7644)
VALERIE S. GRAY, ESQ. (NBN 14716)
2350 W. Charleston Blvd., Suite 100
Las Vegas, Nevada 89102

GARY F. LYNCH
(*pro hac vice forthcoming*)
PATRICK D. DONATHEN
(*pro hac vice forthcoming*)
**LYNCH CARPENTER LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222

*Attorneys for Plaintiff*